# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CYPRUS AMAX MINERALS COMPANY,
a Delaware Corporation,

       Plaintiff/Counterdefendant,

vs.                                       No. CIV 03-1473 JB/ACT

DURAN SAND AND GRAVEL, INC., a
New Mexico Corporation,

       Defendant/Counterclaimant/Third-Party Plaintiff,

vs.

PHELPS DODGE CORPORATION,
a Delaware Corporation,

       Third Party Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant/Counterclaimant Duran Sand and Gravel's Motion for Partial Summary Judgment, filed September 13, 2004 (Doc. 26); and (ii) the Plaintiff/Counterdefendant Cyprus Amax Minerals Company's Motion for Summary Judgment on Accord and Satisfaction, filed September 13, 2004 (Doc. 27). The Court held a hearing on these motions on December 28, 2004. The primary issue is whether there was a settlement of the contractual damage issue as a result of the termination of the Contract between Defendant/Counterclaimant Duran Sand and Gravel ("Duran") and Plaintiff/Counterdefendant Cyprus Amax Minerals Company ("Cyprus"), such that accord and satisfaction now bars Duran's claims. Because the Court concludes that whether a settlement agreement was formed and whether Duran repudiated the settlement agreement are questions of fact for the jury, the Court will deny Duran's

motion for summary judgment and, except on the issue of fraud, deny Cyprus' motion for summary judgment.

## FACTUAL BACKGROUND

The facts necessary to determine the issue that the parties present are a matter of record. The material facts are undisputed.

On or about July 5, 1999, Duran and Cyprus Amax Minerals Company, predecessor in interest to the current Cyprus Amax Minerals Company,[1] entered into a Contract under which Duran was to provide approximately $ 2.4 million worth of construction services in connection with mine reclamation at the Pecos Mine Operable Unit. See Counterclaim ¶ 3, at 4, filed Jan. 22, 2004 (Doc. 7); Deposition of Eddie Duran at 122-23 (taken May 20, 2004). The construction services in the Contract included materials consolidation and construction of an underdrain. See Contract at 1 (dated July 5, 1999)(attached as Ex. A. to Complaint). Based on invoices it submitted, Cyprus paid Duran approximately $ 2.7 million for work performed under the Contract. See Duran Depo. at 122-23.

Since at least February 4, 2000, Cyprus had been assuring Duran that it had no intention of terminating Duran's work under the Contract. See Letter from Moe A. Pasha to Eddie Roy Duran (dated Feb. 4, 2000); Duran Depo. at 132-33. Design problems arose, however, with the underdrain. See Deposition of James Humphrey at 28-32, 38 (taken June 23, 2004); Deposition of Mohammed

---

[1] The parties dispute whether the proper party to respond to Duran's claims is the successor to the original Cyprus Amax Minerals Corporation or its parent company, Phelps Dodge Corporation. The Court previously dismissed Duran's third-party complaint against Phelps Dodge Corporation. See Order, filed July 2, 2004 (Doc. 25). The parties agree, however, that for purposes of this motion, the Court does not need to decide whether Phelps Dodge Corporation is the proper party. The Court will therefore not decide this issue at this time and will, throughout this opinion, refer to Cyprus Amax Minerals Company ("Cyprus") as the entity to which Duran's claims apply.

A. Pasha at 38-40 (taken June 24, 2004).  Duran indicated to Cyprus that it was not interested in working on the revised underdrain construction.  See Pasha Depo. at 95.  On April 23, 2000, Mohammed A. Pasha, Project Manager for Cyprus, took notes at a meeting in which he indicated: "Duran has been difficult.  We will know whether he will work with us or not because what we are about to present him, overpayment, and Duran will not like it."  Id. at 142.  See April 23 meeting notes (attached as Ex. 37 to Duran's Mem. in Supp. of Partial Summ. J., filed Sept. 13, 2004 (Doc. 31)).

On April 27, 2000, Cyprus suspended Duran's work under the Contract because of the underdrain design problems.  See Humphrey Depo. at 28-32, 38; Pasha Depo. at 38-40, 80, 108.  Until the New Mexico Environmental Department approved the redesign of the underdrain, work could not resume on the project.  See Pasha Depo. at 80.  J. Eddie Humphrey, a Cyprus manager, believed it was unwise for Duran to continue with materials consolidation work until the final design of the underdrain was completed and approved.  See Humphrey Depo. at 33.  Cyprus had concerns about two different contractors -- Duran and a contractor for the underdrain -- working on the same area at the same time.  See id. at 53-54; Pasha Depo. 58-60.  Cyprus nevertheless believed that, after the design work was completed, it was possible for two contractors to work the same area simultaneously.  See Humphrey Depo. at 53-54; Pasha Depo. 58-60.  Cyprus intended to sequence the two contractors to accommodate Duran to the extent possible.  See Pasha Depo. at 59.

On or about June 30, 2000, Cyprus terminated the Contract with Duran.  See Counterclaim ¶ 8, at 5; Duran Depo. at 122-23; Notice of Termination at 1-2 (dated June 28, 2000).  The Notice of Termination stated:  "If you believe that you are owed any amounts for work performed, please describe that work in particular and what percentage of the work described in the Scope of Work

under the contract was completed as of the termination date."  Notice of Termination at 1.  Duran concedes that Cyprus had the right to terminate the Contract under its terms.  See Duran Depo. at 82.  Duran invoiced Cyprus for work completed through the point when work under the Contract stopped.  See id. at 38-39, 113-14, 172.  Although Duran now contends that it believed at all times that it was owed additional amounts for work performed but not invoiced to Cyprus under the Contract, Duran did not at any time after the Contract termination provide an invoice, written description, or claim regarding that work.  See id.

On or about June 23, 2000, Cyprus presented Duran with a reconciliation package, reflecting Cyprus' analysis of amounts paid on Duran's invoices and retainage withheld.   See id. at 163.  Shortly thereafter, Cyprus notified Duran of its interest in having Duran complete the remaining work on the project, but advised Duran that, before a new contract could be executed, it was necessary to resolve issues regarding payment under the original Contract.  See id. at 170.   At this time, Humphrey's intention was to continue working with Duran.  See Humphrey Depo. at 39-40.  On July 20, 2000, Pasha expressed to Duran that the amount of retainage at issue was $208,086.00.  See Electronic message from Moe A. Pasha to Eddie Duran (dated July 20, 2000).  Pasha requested that Duran provide a written response to the reconciliation package.  See id.  In the email, Pasha emphasized:  "This is very critical and needs to be resolved now before any new contract is considered and remaining work is re-started."  Id.  Despite Pasha's articulation of a linkage between this subsequent, or replacement, contract, and the reconciliation issues, it does not appear to be a statement which was well thought out or given fair consideration.  See Pasha Depo. at 125 ("I cannot at that date tell you specifically why that decision was made -- or it's not really even a decision.").

On July 21, 2000, Duran's principal, Eddie Duran, responded to Cyprus in writing, indicating

that he was in the process of inspecting Duran's books, and stated:  "I am aware of how critical solving this is and it is of great importance to me also."  Letter from Eddie Roy Duran to Moe Pasha (dated July 21, 2000).  Eddie Duran was also Mayor of the Village of Pecos.  <u>See</u> Pasha Depo. at 28. Duran requested patience and advised that it would respond promptly in writing as soon as Eddie Duran had thoroughly examined the books.  <u>See</u> Letter from Eddie Roy Duran to Moe Pasha (dated July 21, 2000).  Duran examined its books and supplied its response to the reconciliation package by letter to Cyprus dated August 7, 2000, advising of Duran's position that it had not been overpaid. <u>See</u> Letter from Eddie Roy Duran to Moe Pasha at 1-3 (dated Aug. 7, 2000).  Cyprus addressed the issues that Duran raised in its August 7, 2000 letter in its August 14, 2000 letter.  <u>See</u> Letter from Moe A. Pasha to Eddie Duran at 1-10 (dated Aug. 14, 2000).

According to Eddie Duran, Duran at all times during the reconciliation discussion had no doubt that it was owed the full amount of the retainage at issue.  <u>See</u> Duran Depo. at 329-30, 341. According to Eddie Duran, Duran at all times pertinent to the reconciliation discussion believed that the survey upon which Cyprus based its reconciliation analysis was unreliable and/or false, but that it would not be helpful to perform further surveys because necessary earlier ones had not been done. <u>See</u> <u>id.</u> at 187-89, 329.  Eddie Duran stated that Duran had no doubt, before entering into the negotiated agreement of settlement, that Cyprus was in breach of the Contract.  <u>See</u> <u>id.</u> at 326.

Cyprus offered Duran the opportunity to submit a sole source bid for the remaining construction work outstanding at the Pecos site.  <u>See</u> <u>id.</u> at 192; Letter from Moe A. Pasha to Eddie Roy Duran (dated July 21, 2000).  On August 1, 2000, Duran attended a meeting in Tempe, Arizona, to discuss that project.  <u>See</u> Duran Depo. at 192; Letter from Moe A. Pasha to Eddie Roy Duran (dated July 21, 2000).  At the meeting, Cyprus representatives informed Duran that it was imperative

that overpayment issues regarding Duran invoices be reconciled before Cyprus would enter into a new contractual arrangement with Duran.  <u>See</u> Letter from Carol Barrington and Moe A. Pasha to Eddie Duran at 1 (dated Aug. 3, 2000).  After obtaining two extensions of time, Duran submitted a bid on continuation of the work that Cyprus had requested.  <u>See</u> Letter from Eddie Roy Duran to Phelps Dodge Corporation (dated Aug. 26, 2000).

Duran's bid did not include work involving the underdrain.  <u>See</u> Pasha Depo. at 46-47.  Instead, Cyprus received bids on the underdrain work.  <u>See id.</u> at 48-49.  Cyprus awarded Hamilton Construction the contract for the underdrain work, and Hamilton Construction began work on the redesigned underdrain in November 2000.  <u>See id.</u> at 41, 48-49.

By letter of October 17, 2000, Duran identified areas of disagreement with Cyprus regarding payment for its work on the Pecos Mine project.  <u>See</u> Letter from Eddie Roy Duran to Moe Pasha (dated Oct. 17, 2000).  One portion of the letter also states as follows:

> I would like to point out two major losses in this project:
>
> 1.) One full season of tourism has been lost to the community and businesses in the Pecos Valley due to the shut down of this project.
>
> 2.) It is going to cost PDC and the State of New Mexico a substantial amount of money for th[ese] long term[] delays and changes.  Going into a second winter of construction work and the possibility of the GCL to be placed during the monsoon season could also cause major problems and high costs.

<u>Id.</u>[2]

---

[2] Cyprus contends that this portion of the letter purports to raise concerns on behalf of the community of the Village of Pecos and of the State of New Mexico.  <u>See</u> Letter from Eddie Roy Duran to Moe Pasha at 4 (dated Oct. 17, 2000).  Duran disagrees that the letter raises concerns on behalf of the Village or of the State except in the most attenuated manner and states that, even if it did raise their concerns, those concerns are not material to this motion.  Cyprus has attempted to raise concerns about the fact that, while the contract was being performed, Eddie Duran was also Mayor of the Village of Pecos and was attempting to improperly use his influence as mayor to gain an unfair

On December 18, 2000, Humphrey responded to points made in Duran's October 17, 2000 correspondence and raised concerns that the letter made an improper threat in Eddie Duran's capacity as a public official.  See Letter from J. Eddie Humphrey to Eddie Duran at 7 (dated Dec. 18, 2000). The December 18, 2000 letter further stated that, before Cyprus could enter into a new contract with Duran for completion of the remaining reclamation work on the project, Duran would have to agree to three conditions: (i) satisfactory resolution of the invoice reconciliation on the original Contract; (ii) satisfactory explanation of what Cyprus interpreted as potential threats in the October 17, 2000 letter; and (iii) negotiating a cost-plus-fixed-fee contract acceptable to Cyprus.  See id.  The letter specifically indicated that Cyprus could not consider any future contracts with Duran if there was a "standing dispute" between the parties.  Id.  The letter further stated:  "Only after these issues are settled and [Duran] agrees to contract terms and a working relationship that is mutually acceptable to both [Cyprus] and [Duran], will [Cyprus] enter into a future contract with [Duran]."  Id.

Eddie Duran believed that, for Duran to continue working the project, he had to settle the reconciliation issue.  See Duran Depo. at 310.  On January 3, 2001, Duran wrote to Cyprus offering to satisfy the three conditions stated in the December 18, 2000 letter.  See Letter from Eddie Roy Duran to J. Eddie Humphrey (dated Jan. 3, 2001).  Duran offered: (i) payment to Duran of $16,755.39, as Cyprus suggested, with Cyprus retaining the amount of $192,466.00, which was being held in retainage; (ii) an apology and clarification that statements made in the October 17, 2000 letter were not intended to threaten action in Eddie Duran's capacity as a public official and stating Duran's

---

advantage over Cyprus.  Duran disputes this suggestion and contends that there were in fact instances where Cyprus benefitted from Eddie Duran's position as mayor to assist it with completion of other community development work not related to the mine reclamation contract.  See Pasha Depo. at 27-38.

intention to work together to finalize the project in a manner that would benefit everyone; and (iii) a statement that Duran was "more than willing to meet with your company to negotiate a cost-plus-fixed-fee contract" acceptable to Cyprus.  See id.; Duran Depo. at 215-17.  The letter recognized and acknowledged that the retainage money "is not owed to [Duran]."  Letter from Eddie Roy Duran to J. Eddie Humphrey (dated Jan. 3, 2001).

On February 5, 2001, Cyprus notified Duran of its acceptance of Duran's responses and acknowledged the settlement, stating that Cyprus would settle the retainage issue by returning $16,755.39 to Duran and retaining $192,465.61 as final settlement for overpayment on the contract. See Letter from Moe Pasha to Eddie Roy Duran (dated Feb. 5, 2001); Duran Depo. at 217.  With regard to the remaining work, Cyprus invited Duran to meet to renew the negotiations for a cost-plus-fixed-fee contract acceptable to both parties.  See Letter from Moe Pasha to Eddie Roy Duran (dated Feb. 5, 2001); Duran Depo. at 217.  Cyprus tendered the amount of $16,755.39 to Duran. See Duran Depo. at 217, 235.  Duran has retained the $16,755.39 and, at no time, has made any effort to return it, because Duran contends that this amount was owed to it.  See id.

Duran and Cyprus met and renewed contract negotiations on February 6, 2001.  See Duran Depo. at 256; Letter from Moe A. Pasha to Eddie Duran at 1 (dated Feb. 15, 2001).  At that time, Pasha did not convey to Duran any estimated startup date for work.  See Pasha Depo. at 149.  On February 15, 2001, Pasha told Duran to prepare a revised bid for Cyprus as part of the bid process. See Letter from Moe A. Pasha to Eddie Duran at 1 (dated Feb. 15, 2001).  On March 5, 2001, Duran wrote to Cyprus to thank it for giving Duran the opportunity to bid on the remainder of the work and indicated that, "[a]fter giving this a great deal of study and thought, I have decided not to resubmit the bid for this project.  I really feel this is what's best for my company."  Letter from Eddie Roy

Duran to Moe Pasha (dated Mar. 5, 2001). <u>See</u> Duran Depo. at 231. Duran further noted: "Not being certain on what the starting date will be for this project makes it very difficult for [Duran] to make a commitment." Letter from Eddie Roy Duran to Moe Pasha (dated Mar. 5, 2001). Duran did not indicate in the March 5, 2001 letter that it believed it did not have a settlement. <u>See</u> Duran Depo. at 261-62. Duran did not learn anything new after March 5, 2001 that formed a basis for filing its Counterclaim. <u>See id.</u> at 262.

## PROCEDURAL BACKGROUND

On December 30, 2003, Cyprus filed a Complaint for Declaratory Judgment or, in the Alternative, Breach of Contract and Unjust Enrichment (Doc. 1). Count I seeks a declaratory judgment stating: (i) neither Cyprus nor its predecessor breached the Contract; (ii) Duran accepted $16,755.39 in settlement and full accord and satisfaction of all amounts allegedly owed Duran under the Contract; and (iii) the settlement is enforceable. Counts II and III assert, in the alternative, causes of action for breach of contract and unjust enrichment, respectively, against Duran.

On January 22, 2004, Duran filed an Answer, Counterclaim, and Third Party Complaint (Doc. 7). Duran has included in its counterclaim allegations of fraud and duress. Specifically, Duran contends Cyprus induced it, by fraudulent conduct and duress, into waiving and settling its claims for payment under the Contract and into entering into the settlement agreement. <u>See</u> Counterclaim ¶¶ 12-15, at 6-7. Duran seeks to set aside the settlement based on these principles. Duran also seeks damages "for money owed under the contract for work performed," <u>id.</u> ¶ 1, at 7, and damages for Duran's reliance on Cyprus' "affirmative promises that it would not terminate the contract in June 2000, and would renegotiate another contract with Duran in the fall of 2000," <u>id.</u> ¶ 3, at 7.

At the initial scheduling conference, the parties identified to the Court an issue for preliminary

resolution before proceeding with discovery and trial on the merits.  Cyprus has placed that issue before the Court in its request for declaratory judgment and its accord and satisfaction defense to Duran's counterclaim.  This issue is currently before the Court in the parties' competing motions for summary judgment.  On September 13, 2004, Duran moved the Court for summary judgment on Count I of Cypress' Complaint.  That same day, Cyprus moved the Court for entry of an order granting summary judgment:  (i) on its request for a declaration that Duran accepted from Cyprus the sum of $16,755.39 in settlement of all amounts owed to Duran under the July 5, 1999 Contract between Duran and Cyprus; and (ii) on Duran's counterclaim in its entirety, based upon Cyprus' defense of accord and satisfaction.

On December 28, 2004, the Court held a hearing on the parties' cross motions for summary judgment. At the end of the hearing, the Court indicated that it was inclined to deny both motions, but took the matter under advisement.  <u>See</u> Transcript of Hearing at 51:9-53:16 (taken Dec. 28, 2004).[3]  This written opinion follows the Court's careful consideration of the briefs, evidence, arguments made at the hearing, and the applicable law.

## <u>STANDARD</u>

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.</u>, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the

---

[3] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

light most favorable to the nonmoving party." Id. (internal quotations omitted).  Under rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  See id. at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists.  See Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. See id.  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id.; Kaus v. Standard Ins. Co., 985 F.Supp. 1277, 1281 (D. Kan. 1997) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

Accord and satisfaction is appropriately found on summary judgment where no material disputed fact exists.  See United States v. Sackett, 114 F.3d 1050, 1052 (10th Cir. 1997) (applying New Mexico law).  The Court will consider the parties' motions in light of these standards.

## ANALYSIS

The issue whether a settlement agreement is enforceable is resolved by applying state contract law.  See United States v. McCall, 235 F.3d 1211, 1215 (10th Cir. 2000).  The public policy of New Mexico favors amicable settlement of claims without litigation when the agreements are fairly secured, are without fraud, misrepresentation, or overreaching, and are supported by consideration.

11

See Ratzlaff v. Seven Bar Flying Serv., Inc., 98 N.M. 159, 163, 646 P.2d 586, 590 (Ct. App. 1982).

The doctrine of accord and satisfaction bars an action for damages based upon claims that the parties have already resolved.  "An accord and satisfaction is a method of discharging a contractual obligation by substituting for such contract an agreement for the satisfaction thereof and performing the substituted agreement."  National Old Line Insurance Co. v. Brown, 107 N.M. 482, 484, 760 P.2d 775, 777 (1988).  When the substitute contract is performed as agreed, there is an accord and satisfaction, and the previously existing claim is discharged, permitting no further action to be brought based upon that claim.  See id. at 484, 760 P.2d at 777.  "As with any contract, an accord requires offer, acceptance, and a consideration to be enforceable."  Id.  A contracting party, however, may repudiate performance under a contract if a condition precedent to that performance cannot be met. See Evatt v. Steele, 109 N.M. 183, 185, 783 P.2d 959, 961 (1989).

## I.      THE ISSUE OF WHETHER A SETTLEMENT AGREEMENT WAS FORMED IS A QUESTION OF FACT FOR THE JURY.

The issue of whether a contract exists is a mixed question of law and fact.  See Naimie v. Cytozyme Labs., Inc., 174 F.3d 1104, 1111 (10th Cir. 1999). The threshold question of whether a contract is ambiguous is a question of law.  See Ramirez v. Johnny's Roofing, Inc., 1999-NMCA-038, ¶ 8, 127 N.M. 83, 85, 977 P.2d 348, 350.  An agreement is ambiguous when its language permits more than one reasonable interpretation.  See Gutierrez v. Sundancer Indian Jewelry, Inc., 117 N.M. 41, 44, 868 P.2d 1266, 1269 (Ct. App. 1993).  If the court finds an ambiguity, the jury resolves the ambiguity as an issue of fact.  See C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 507, 817 P.2d 238, 241 (1991).  The question of the meaning to be given words of a contract is a question of fact where that meaning depends on reasonable but conflicting inferences to be drawn

from events occurring or circumstances existing before, during, or after negotiation of the contract. See id. at 509, 817 P.2d at 243. Where no reasonable person would decide the issue in any way but one, then the issue can be described as a question of law. See id. at 510, 817 P.2d at 244.

Although the parties agree on the sequence of letters that form the negotiations, the parties dispute which terms in the letters constitute the actual settlement agreement and whether the parties ever reached a firm agreement. For instance, the parties dispute which letters constitute the offer and acceptance. Duran contends that the December 18, 2000 letter contained the offer and its January 3, 2001 letter accepted the offer. See Duran's Reply to Cyprus' Resp. to Mot. for Partial Summ. J. at 2, filed Oct. 19, 2004 (Doc. 39). Cyprus, in contrast, asserts that Duran's January 3, 2001 letter constituted the offer, and Cyprus accepted that offer in its February 5, 2001 letter. See Cyprus' Mem. in Supp. of Mot. for Summ. J. on Accord and Satisfaction at 8, filed Sept. 13, 2004 (Doc. 32).

Moreover, the parties dispute which terms actually comprise the settlement agreement. Cyprus argues that the settlement agreement was reached on February 5, 2001, when Cyprus accepted Duran's offered terms and agreed to return $16,755.39 of the retainage to Duran and retain the remaining balance of $192,465.61 as final settlement for the invoice reconciliation. Cyprus contends that its subsequent payment of $16,755.39 satisfied the agreement. Under Cyprus' interpretation, the settlement agreement is confined to the first condition listed in the January 3, 2001 offer. Duran contends that the third condition – negotiating a new contract – set forth in the December 18, 2000 and January 3, 2001 letters was a term of the settlement agreement. Duran argues that, absent this third condition, the agreement would not be supported by consideration. Duran contends that Cyprus agreed in its December 18, 2000 letter that it owed Duran $16,755.39 for work performed. Duran asserts that, because Cyprus did not dispute that Duran was entitled to

13

the $16,755.39, Cyprus had no lawful basis to retain it.  Duran thus contends that the $16,755.39 was

independent of the retainage dispute and cannot be deemed consideration for the settlement.[4]  Duran

argues that the only legally recognizable consideration for its agreeing to give up its right to the

remaining $192,465.61 in retainage was that the parties would enter into good faith negotiations, the

anticipated result being a resumption of work in a timely manner.

The Court concludes that there is a question of fact as to what the terms of the settlement

agreement are and whether the parties reached a definite, firm agreement.  The December 18, 2000

and January 3, 2001 letters each contain three conditions.  The December 18, 2000 letter stated that,

before Cyprus could enter into a new contract with Duran for completion of the remaining

reclamation work on the project, Duran would have to agree to three conditions: (i) satisfactory

resolution of the invoice reconciliation on the original Contract; (ii) satisfactory explanation of what

Cyprus interpreted as potential threats in the October 17, 2000 letter; and (iii) negotiating a cost-plus-

fixed-fee contract acceptable to Cyprus.  See Letter from J. Eddie Humphrey to Eddie Duran at 7

(dated Dec. 18, 2000).  The December 18, 2000 letter stated that only if the three conditions were

settled would Cyprus enter into a future contract with Duran.  See id.  In its January 3, 2001 letter,

_____

[4]Duran also contends that it was a violation of NMSA § 57-28-9 for Cyprus to continue to
hold the $16,755.39 in retainage.  NMSA § 57-28-9 was not effective, however, until June 15, 2001
-- after the time during which the parties negotiated the retainage issue.  Duran nevertheless argues
that this statute should be given effect based on Hasse Contracting Co., Inc. v. KBK Financial, Inc.,
127 N.M. 316, 320, 980 P.2d 641, 645 (1999).  In Hasse Contracting Co., Inc. v. KBK Financial,
Inc., the Supreme Court of New Mexico construed an amendment to a statute, even though the
amendment was made after the parties executed the contract.  See id.  The court concluded that the
amendment did not constitute a change in the applicability of the statute, but rather clarified the way
the legislature always intended the statute to operate.  See id.  Because the Hasse Contracting Co.,
Inc. v. KBK Financial, Inc. case analyzed an amendment to an existing statute to determine the
meaning of the statute, that case is distinguishable from the situation here in which Duran is asking
that the Court give effect to a new statute enacted after the events at issue.  The Court therefore
concludes that NMSA § 57-28-9 is not relevant to the Court's analysis.

Duran responded to each of the three conditions and indicated its willingness to meet with Cyprus to negotiate a new contract.  See Letter from Eddie Roy Duran to J. Eddie Humphrey (dated Jan. 3, 2001).  Cyprus replied that it accepted Duran's "responses," would settle the retainage issue by returning $16,755.39 and retaining $192,465.61, and invited Duran to meet with Cyprus to begin negotiations on a new contract.  See Letter from Moe Pasha to Eddie Roy Duran (dated Feb. 5, 2001).

The Court determines that there is more than one reasonable way to interpret the language in this sequence of letters.  First, a reasonable person could construe the letters as constituting an agreement involving only the first condition.  It is, however, also reasonable to interpret the first condition in the December 18, 2000 and January 3, 2001 letters – satisfactory resolution of the invoice reconciliation – as being part of a larger agreement that included the second and third conditions.  In other words, a reasonable person could find that the parties only agreed to settle the reconciliation issue if the other two conditions were resolved.  A reasonable person could therefore either find that the parties did indeed reach a settlement agreement, comprising one or three conditions, or that the letters were merely part of continuing negotiations that required resolution of all the issues before a true contract could be deemed formed.  The Court thus concludes that the language in the letters is ambiguous regarding whether an agreement was reached and what the terms of the agreement are.  Not only is the language in the letters unclear, but the extrinsic evidence concerning the intent of the parties is also not conclusive of the agreement's terms.  Eddie Duran understood that he agreed not to contest the $192,465.61 in exchange for negotiating a new contract that would result in his resuming work on the project.  See Duran Depo. at 217-18.

Given these ambiguities, the Court cannot say as a matter of law that the settlement agreement

included only an agreement that Cyprus pay Duran $16,755.39 and Cyprus could retain the remaining amount.  Because the terms are disputed, this Court also cannot find as a matter of law that a settlement contract was formed.  The Court therefore concludes that whether there was a settlement agreement and an accord and satisfaction is a question of fact to be determined by a jury.  See United States v. McCall, 235 F.3d at 1215 (concluding that issue whether contract was formed was primarily a factual determination where fact finder examined history of settlement negotiations, parties' intent, and nature of settlement offer to resolve issue); C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 507, 817 P.2d at 241 ("[I]f the proffered evidence is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the ultimate factual issues must be resolved by the appropriate fact finder with the benefit of a full evidentiary hearing.").  Accordingly, the Court will deny Cyprus' motion for summary judgment on Count I.

## II.   WHETHER DURAN REPUDIATED THE SETTLEMENT AGREEMENT IS A QUESTION OF FACT FOR THE JURY.

In its motion for partial summary judgment, Duran contends that it is entitled to summary judgment on Count I because it repudiated the settlement agreement when Cyprus unreasonably delayed in entering into a new contract with Duran.  Duran argues that its conceding the reconciliation issue was conditioned upon Duran's resuming work on the project within a reasonable time.  Duran asserts that Cyprus' delay in responding to Duran's January 3, 2001 letter and Cyprus' requirement that Duran submit a revised proposal for the project resulted in Duran not being able to begin work on the project within a reasonable time.  Duran contends that these delays resulted in the condition precedent to the settlement agreement being unsatisfied.  Duran thus contends that it was free to repudiate the settlement agreement, which Duran asserts it did when it sent its March 5, 2001

letter notifying Cyprus that Duran did not intend to submit a revised bid proposal.

Duran's argument that it repudiated the settlement agreement is contingent on the Court determining that a condition precedent of the agreement was Duran resuming work on the project without unreasonable delay.  The Court has already concluded that whether the parties formed a settlement agreement and the terms of any such agreement are questions of fact for the jury.  The jury will thus initially have to determine whether a settlement agreement exists and whether any such agreement contains conditions precedent before the repudiation issue can be determined.  Duran's motion for partial summary judgment based on repudiation of the settlement agreement will therefore be denied because of the preliminary factual issues that need to be resolved.

III.   **THE ISSUE OF DURESS IS A QUESTION OF FACT FOR THE JURY.**

Duran also argues that it is entitled to summary judgment on Count I based on economic duress.  Duran contends that the undisputed facts show that Cyprus used its superior bargaining power, because Duran needed the future work, to coerce Duran into accepting the reconciliation figures.  Cyprus asserts that Duran is barred as a matter of law from raising the issue of duress because Duran cannot demonstrate wrongful conduct or that any wrongful conduct caused Duran to enter the alleged settlement agreement.

A party who entered a contract under duress is excused from performing his obligations under the contract.  See Richards v. Allianz Life Ins. Co. of North America, 2003-NMCA-001, ¶ 31, 133 N.M. 229, 236, 62 P.3d 320, 327 (quoting UJI 13-838 NMRA).  "[T]he fundamental issue in duress cases is whether the statement which induced the agreement is the type of offer to deal that the law should discourage as oppressive and thus improper."  Id. at ¶ 30, 133 N.M. at 236, 62 P.3d at 327. To constitute duress, the conduct must be wrongful.  See id. at ¶ 32, 133 N.M. at 237, 62 P.3d at

328.  Per se wrongful conduct occurs when what is threatened is a crime, tort, criminal prosecution, use of civil process, or a breach of the duty of good faith and fair dealing under a contract with the recipient.  See id. at ¶ 33, 133 N.M. at 237, 62 P.3d at 328.  A threat is also improper if the resulting exchange is not on fair terms and either (i) the threatened act would harm the recipient and would not significantly benefit the party making the threat; (ii) the effectiveness of the threat in inducing the assent is significantly increased by prior unfair dealing by the party making the threat; or (iii) what is threatened is otherwise a use of power for illegitimate ends.  See id. at ¶ 34, 133 N.M. at 237, 62 P.3d at 328.  Although the New Mexico Court of Appeals in Richards v. Allianz Life Ins. Co. of North America noted that no prior New Mexico case had considered this second category of improper threat, the court nevertheless concluded that this class of threat "appears well-grounded," and thus, the court considered it.  See id.

The Court finds that questions of fact exist as to the following threat such that the Court cannot conclude that either party is entitled to summary judgment on the duress issue:  a threat "is improper if the resulting exchange is not on fair terms" and "the threatened act would harm the recipient and would not significantly benefit the party making the threat."  Id. (quoting Restatement (Second) of Contracts § 176(2)).  The Court has already determined that the terms of the settlement agreement, assuming there is one, is a question of fact for the jury.  Without knowing the terms of the agreement, the Court cannot determine as a matter of law whether the terms of the exchange were fair.  Moreover, the Court finds that a question of fact exists concerning whether the threatened act – refusal to grant a future contract – would harm Duran and would not significantly benefit Cyprus.  Although it may be beneficial for a party not to enter into a new contract with another party with whom the first party has a financial dispute, there is also evidence in the record suggesting that

Cyprus preferred that Duran finish the materials construction work. <u>See</u> Humphrey Depo. at 12, 40, 50; Pasha Depo. at 71-72; Letter from Moe A. Pasha to Eddie Roy Duran (dated Feb. 4, 2000) ("[Cyprus] prefers to work with [Duran] through project completion with mutually beneficial terms."). A jury could thus infer that Cyprus would not significantly benefit from withholding future work from Duran.

Additionally, the Court finds that questions of fact exist whether Cyprus' alleged threat caused Duran to enter into the alleged settlement agreement. Eddie Duran stated that he agreed not to contest the $192,465.61 in exchange for negotiating a new contract that would result in his resuming work on the project. <u>See</u> Duran Depo. at 217-18. The language in the December 18, 2000, January 3, 2001, and February 5, 2001 letters also suggest that Duran's motive for relinquishing any rights to the disputed retainage was its anticipation of future work on the project. A jury could therefore find from these facts that Duran met the causation requirement necessary to show duress.

The Court therefore denies both Duran's motion for partial summary judgment on Count I based on duress and Cyprus' motion for summary judgment on Duran's duress counterclaim.

## IV.    CYPRUS IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW ON DURAN'S COUNTERCLAIM TO SET ASIDE THE ALLEGED SETTLEMENT BASED ON FRAUD.

To prove fraud, the party asserting the claim must prove: (i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation. <u>See</u> <u>Williams v. Stewart</u>, 2005-NMCA-061, ¶ 34, 137 N.M. 420, 429, 112 P.3d 281, 290. <u>See</u> <u>also</u> UJI 13-1633 NMRA. The party asserting fraud must prove each of these elements by clear and convincing evidence. <u>See</u> UJI 13-1633 NMRA. Cyprus

is entitled to summary judgment on Duran's fraudulent misrepresentation claim as a matter of law because Duran cannot prove that Cyprus misrepresented a fact or that Cyprus had the intent to deceive and to induce reliance on the misrepresentation.

Duran asserts that Cyprus misrepresented its intention to enter into a contract with Duran. Specifically, Duran contends that Cyprus misrepresented to Duran that Duran would be awarded the subsequent contract and would be able to resume work on the remediation project to induce Duran to resolve the reconciliation issue when Cyprus would not or could not provide Duran with additional work. The evidence, however, does not support Duran's argument. First, the evidence in the record demonstrates that Cyprus preferred that Duran finish the materials construction work. See Humphrey Depo. at 12, 40, 50; Pasha Depo. at 71-72, 156-57; Letter from Moe A. Pasha to Eddie Roy Duran (dated Feb. 4, 2000). Second, the exchange of letters indicates that Cyprus wanted to negotiate a future contract with Duran. See Letter from J. Eddie Humphrey to Eddie Duran at 7 (dated Dec. 18, 2000); Letter from Moe Pasha to Eddie Roy Duran (dated  Feb. 5, 2001). Furthermore, Cyprus began reviewing Duran's bid and requested that Duran submit a revised bid. See Letter from Moe A. Pasha to Eddie Duran (dated Feb. 15, 2001). Cyprus indicated it wanted to complete the bid review process by mid-March 2001. See id. The negotiations into the new contract ceased when Duran informed Cyprus that it decided not to resubmit the bid for the project due to the uncertain starting date of the project. See Letter from Eddie Roy Duran to Moe Pasha (dated Mar. 5, 2001). This evidence demonstrates that Cyprus intended to enter into a contract with Duran.

Duran nevertheless argues that Cyprus' request that Duran resubmit its bid shows that Cyprus wanted to continue delaying Duran and did not really intend to enter into a contract with Duran. Duran's argument, however, is supposition, not evidence. Cyprus' request for Duran to submit a bid

20

instead indicates that it intended to review the bid and, if the bid was acceptable, enter into a contract. See Letter from Moe A. Pasha to Eddie Duran (dated Feb. 15, 2001).  Moreover, the evidence indicates that Duran was the sole source bid and that Cyprus had not received other bids for the materials consolidation portion of the project at the time Cyprus was negotiating with Duran, indicating that Cyprus intended to enter into a contract with Duran.  See Pasha Depo. at 71-72 ("At this point, we are entertaining Duran Sand and Gravel to be a sole source bidder.  And so no, the intention here was to just go to Mr. Duran and get his numbers."); Humphrey Depo. at 12, 40.

The only real evidence that Duran points to indicating Cyprus' reservations about entering into a contract with Duran were Pasha's general concerns about Eddie Duran and Humphrey's testimony that Cyprus delayed in responding to Duran's January 3, 2001 letter because his bosses had concerns about entering into a future contract with Duran.  See Pasha Depo. at 129-30, 154-55; Humphrey Depo. at 11-13.  This evidence, however, is not sufficient to create a genuine issue of material fact regarding fraud.  Pasha's statement in a note that Duran was trying to milk Cyprus for every penny was made in response to a particular invoice that Duran submitted and reflected Pasha's belief that Duran should have borne, as a cost of doing business, what Duran was charging Cyprus. See Pasha Depo. at 129-30.  This statement was not made in regard to negotiations for the future contract and does not create a genuine issue of material fact that Cyprus did not intend to enter into a contract with Duran, especially in light of Pasha's statements in his deposition that Cyprus always intended to continue working with Duran.  See id. at 71-72, 156-57.  Furthermore, any concerns by Pasha regarding Eddie Duran using his position as mayor to the disadvantage of Cyprus were resolved in the exchange of letters in which Eddie Duran apologized and explained that he never intended to use his position as mayor against Cyprus.  See Letter from Eddie Roy Duran to J. Eddie

Humphrey at 1 (dated Jan. 3, 2001).  Pasha's concern is thus not evidence that Cyprus did not intend to enter into a future contract with Duran.  As for Pasha's concerns about Eddie Duran's litigiousness and the additional concerns of Humphrey's bosses, Humphrey stated that he went to battle to keep Duran on the project and that he "prevailed" in convincing his bosses that Duran was worth taking a chance on based on his "solid" work.  Humphrey Depo. at 12.  This evidence indicates that, although individuals within Cyprus initially may have had concerns about giving Duran another contract, ultimately they all agreed to move forward with Duran.  See id.  Duran therefore cannot prove that Cyprus did not intend to enter into a future contract with Duran for the remaining work on the project.

Finally, Duran contends that Cyprus misrepresented the urgency in needing to resolve the reconciliation issue when Cyprus was not in a position to offer Duran immediate work, because of the ongoing work by Hamilton Construction on the underdrain.  Duran argues that Cyprus' statement that it "must move forward" was a misrepresentation.  This statement, however, cannot support a claim for fraudulent misrepresentation, as it simply conveys Cyprus' desire to resolve the reconciliation issue and move forward with business relations.  Duran nonetheless contends that it is a misrepresentation because Hamilton Construction's presence precluded Duran from resuming work, and thus, the parties could not "move forward."  Duran's argument, however, is not supported by the evidence.  Although Cyprus had concerns about the two different contractors working on the same area at the same time, Cyprus nevertheless believed that it was possible for two contractors to work the same area simultaneously.  See id. at 53-54; Pasha Depo. 58-60.  Cyprus intended to sequence the two contracts to accommodate Duran to the extent possible.  See Pasha Depo. at 59. The evidence thus does not support Duran's contention that Hamilton Construction's presence

22

precluded Duran from resuming work.

Because Duran cannot prove either the first or third elements necessary for a fraudulent misrepresentation claim (a misrepresentation of fact and intent to deceive and to induce reliance on the misrepresentation), the Court will deny Duran's motion for summary judgment on Count I of Cyprus' complaint based on fraud. In addition, Cyprus is entitled to summary judgment as a matter of law on Duran's counterclaim seeking to set aside the alleged settlement agreement based on fraud.

## CONCLUSION

**IT IS THEREFORE ORDERED**, for the reasons stated herein, that

1.      Defendant/Counterclaimant Duran Sand and Gravel's Motion for Partial Summary Judgment (Doc. 26) is DENIED; and

2.      Plaintiff/Counterdefendant Cyprus Amax Minerals Company's Motion for Summary Judgment on Accord and Satisfaction (Doc. 27) is GRANTED in part and DENIED in part. Cyprus is GRANTED summary judgment on Duran's counterclaim seeking to set aside the alleged settlement agreement based on fraud. In all other respects, Plaintiff/Counterdefendant Cyprus Amax Minerals Company's Motion for Summary Judgment on Accord and Satisfaction (Doc. 27) is DENIED.

_____
UNITED STATES DISTRICT JUDGE

23

*Counsel*:

David L. Plotsky
Plotsky & Dougherty, P.C.
Albuquerque, New Mexico

   *Attorney for Defendant/Counterclaimant Duran Sand and Gravel*

C. Mark Kittredge
Brown and Bain, P.A.
Phoenix, Arizona

--and--

Douglas A. Baker
Martha G. Brown
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

   *Attorneys for Plaintiff/Counterdefendant Cyprus Amax Minerals Company*